**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

2020 MAR 17 A 7:12

DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF MAINE *ex rel.* [UNDER SEAL]<br><br>*Plaintiffs*,<br><br>v.<br><br>[UNDER SEAL]<br><br>*Defendants*. | **Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. & the Maine False Claims Act, ME. REV. STAT. ANN. tit. 22, § 15-A (2019)**<br><br>**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2) & ME. REV. STAT. ANN. tit. 22, § 15-A(4)(B)(3).**<br><br>**Jury Trial Demanded** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

2020 MAR 17 A 7:12

DEPUTY CLERK

UNITED STATES OF AMERICA AND STATE OF MAINE *ex rel.* SCOTT CRYER,

*Plaintiff,*

v.

Wells Emergency Medical Services, Inc.
114 Sanford Road
Wells, ME 04090

James Lapolla
114 Sanford Road
Wells, ME 04090

York Hospital
1 Loving Kindness Way
York, Maine 03909

*Defendants.*

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* & the Maine False Claims Act, ME. REV. STAT. ANN. tit. 22, § 15 (2013)**

**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)**

**Jury Trial Demanded**

## FIRST AMENDED COMPLAINT

## INTRODUCTION

NOW COMES Plaintiff-Relator Scott Cryer ("Relator" or "Cryer"), by his attorneys, against Defendants Wells Emergency Medical Services, Inc. ("WEMS"), James Lapolla ("Lapolla"), and York Hospital (collectively "Defendants") on behalf of the United States of America and the State of Maine to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA" or "False Claims Act"), the

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS" or "Anti-Kickback Statute"), and the Maine False Claims Act, 22 M.R.S.A. § 15 (2013) ("MFCA" or "Maine False Claims Act").

## I. Nature of the Case

1. This is an action brought under, *inter alia,* the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.* as amended; and the Maine False Claims Act, 22 M.R.S.A. § 15 (2013) *et seq.* to recover damages and civil penalties from Defendants on behalf of the United States of America and the State of Maine, (collectively "the Government"), and individually.

2. The Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4)(B) and has direct and independent knowledge of the allegations set forth in this Complaint.

3. Pursuant to 31 U.S.C. § 3730(b)(2), Relator has provided the Government with a copy of the Complaint and a written disclosure of substantially all material evidence and information in his possession.

4. For the past ten years, at a minimum, Defendants have intentionally and knowingly submitted false and fraudulent claims to the Government. Specifically, Defendants have consistently upcoded and billed all non-emergency medical transports as emergency transports in order to increase their reimbursement from the Government for services.

## II. Jurisdiction and Venue

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732(a).

6. Cryer's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

7. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because WEMS is headquartered in this judicial district and because Lapolla resides in this judicial district.

8. Venue is proper in this Court under 28 U.S.C. §1391(c), 28 U.S.C. § 1395(a) and 31 U.S.C. § 3732(a) because WEMS is headquartered in Maine and because the complained-of illegal acts occurred within this judicial district.

9. None of the allegations set forth in this Complaint have been "publicly disclosed," or are substantially the same as allegations that have been "publicly disclosed," as that phrase is used in 31 U.S.C. § 3730(e)(4)(A).

## III. Parties

10. Relator Cryer is a twenty-seven-year-old male and a resident of York County, Maine.

11. Cryer has worked as an emergency medical technician (EMT) for several local EMS departments since in or around 2010, when he received his EMT certification.

12. Cryer graduated with a Bachelor of Arts in Mass Communications from the University of Maine in or around 2014.

13. Cryer began working as an EMT for WEMS in or around 2012.

14. Cryer briefly left WEMS to serve as a Logistics Officer in the U.S. Marine Corps between 2014 and 2018; however, he returned to WEMS after his honorable discharge from the Corps.

15. Cryer also works as an EMT for the city of Ogunquit, Maine.

16. Defendant WEMS is a Maine corporation that provides commercial ambulance and other healthcare-related transportation operations services.

17. James Lapolla is the Director of WEMS and is the individual responsible for overseeing the company.

18. WEMS provides both emergency ambulance transports and non-emergency interfacility transfers.

19. Emergency transports are reimbursable by CMS at a higher rate than interfacility transfers.

20. WEMS has been in business for over twenty (20) years and, at present, provides approximately 300 interfacility transports per year.

21. Cryer estimates that WEMS improperly upcodes approximately 150 ambulance transfers a year.

22. WEMS has been upcoding interfacility transfers as emergency transfers for at least ten years.

23. WEMS employs approximately between 30 and 50 people.

24. Defendant York Hospital is a healthcare facility primarily located in York, Maine.

25. York Hospital's Main Campus is located at 1 Loving Kindness Lane, York, Maine, 03909.

26. York Hospital operates a number of other facilities in southern Maine, including a walk-in care facility in York, Maine, a hospital located near Long Sands Beach in York, Maine, a Hospital in Berwick, Maine, a hospital in Kennebunk, Maine, a hospital in Kittery, Maine, a hospital in Sanford, Maine, a hospital in South Berwick, Maine, and a hospital in Wells, Maine.

27. York Hospital has been in business since 1906.

28. York Hospital was recently sanctioned by Centers for Medicare and Medicaid Services for allowing unlicensed physicians to perform surgical procedures.

## IV. Overview of Applicable Law and Regulations

### a. The Federal False Claims Act

29. The FCA prohibits knowingly presenting, or causing to be presented, to the federal Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

30. The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. Id.

31. Any person who violates the FCA is liable for civil penalties. The amount of the civil penalty per each false claim resulting from these violations of the False Claims Act is currently listed as $11,181 to $22,363 per false claim for penalties assessed after January 29, 2018, when the associated violation occurred after November 2, 2015. 28 C.F.R. § 85.5.

### b. The Maine False Claims Act

32. The Maine False Claims Act makes it unlawful to 1) knowingly make or cause to be made a false or fictitious claim for payment against the Department of Health and Human

Services, or to 2) enter into any agreement to defraud the department by obtaining the payment of any materially false, fictitious, or fraudulent claim. 22 M.R.S.A. § 15 (2013).

33. The Maine False Claims Act also makes it unlawful to knowingly make or cause to be made a false written statement or record material to an obligation to cause the Department of Health and Human Services to pay any money as a result of a false, fictitious, or fraudulent claim. 22 M.R.S.A. § 15 (2013).

34. Enrolled providers of medical services to Medicaid recipients, including Defendants, are eligible for and have in fact collected reimbursement for covered services submitted for payment under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. As a condition of participating in the Medicaid program, enrolled providers agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to required records and information.

**c. Medicare and Medicaid Overview**

35. Medicare is a federal health insurance program which was established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 301-1397mm.

36. Medicare pays for covered medical care provided to eligible aged and disabled persons.

37. Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services, hospital outpatient services and certain ambulance services. *See* 42 U.S.C. §§ 1395k.

38. Medicaid is a government health insurance program for persons with limited income that is jointly funded by the federal and state governments. *See* 42 U.S.C. §§ 1396, *et seq*. Each State administers its own Medicaid program.

39. MaineCare, the Medicaid program for the state of Maine, is administered by the Maine Department of Health and Human Services.

40. Centers for Medicare & Medicaid Services ("CMS") is a federal agency within the United States Department of Health and Human Services ("HHS") that administers the Medicare program and works in partnership with state governments to administer Medicaid.

41. CMS uses the Healthcare Common Procedure Coding System ("HCPCS") to bill for various services including ambulance transport services. These codes represent the procedures, supplies, products, and services which may be provided to Medicare beneficiaries and to individuals enrolled in private health insurance programs.

42. CMS uses private carriers to process requests for insurance coverage. CMS uses a different carrier code for each state.

43. A number of states are also divided into different localities and are assigned various locality codes.

44. Maine is assigned the carrier code 14112. York County, Maine, is assigned the locality code 03.

**d. Reimbursements for Ambulance Transports**

45. CMS publishes an annual ambulance fee schedule that indicates the ambulance rates for the calendar year. The fee schedule lists rates based on the carrier code, the locality code, and the HCPCS code.

46. The CMS fee schedule also distinguishes between services provided in urban areas, rural areas, and "lowest quartile" rural areas, as defined by 42 C.F.R. § 414.1305.

47. All transfers by WEMS are considered rural transfers.

48. An interfacility transfer is the movement of a patient from one health care facility to another. Examples of interfacility transfers include hospital to hospital transfers, clinic to hospital transfers, hospital to rehabilitation facility transfers, and hospital to long-term care facility transfers.

49. Ambulance transfers are either classified as Basic Life Support ("BLS") transfers or Advanced Life Support ("ALS") transfers, depending on the equipment and staff onboard.

50. Ambulance transfers are also classified as either emergency transfers or non-emergency transfers.

51. Ambulance transfers are assigned different HCPCS codes depending on whether they are BLS transfers or ALS transfers, and whether they are emergency transfers or non-emergency transfers.

52. Interfacility transfers are non-emergencies and should be billed at the BLS non-emergency rate. The BLS non-emergency rate for York County, Maine is $237.97 for rural transfers for CY2019. *See* CY2019 Ambulance Fee Schedule, Centers for Medicare & Medicare Service.

53. Emergency transports are billed at either the BLS Emergency Rate or the ALS Emergency rate. The BLS Emergency Rate and ALS Emergency Rate for York County, Maine are $380.75 and $452.14, respectively, for rural transfers for CY2019. *See* CY2019 Ambulance Fee Schedule, Centers for Medicare & Medicare Service.

## V. Factual Allegations

### a. WEMS' Billing Practices

54. WEMS provides both emergency transport services and non-emergency interfacility transfers.

55. Interfacility transfers are non-emergencies and are reimbursable at a rate of approximately $237.00 plus mileage per transfer.

56. Emergency transports are reimbursable at a rate of approximately $380.00-$452.00 per transport, depending on whether they are BLS transports or ALS transports.

57. Approximately 80% of the transfers conducted by WEMS are billed to Medicare.

58. James "Jim" Lapolla has made himself the sole person responsible for submitting claims for reimbursement to both CMS and private insurance.

59. Lapolla does not allow anyone else to review the billing documents or have access to patient information, except for the Assistant Director, Chris Paré.

60. WEMS Policies and Procedures of June 16, 2018 set forth the requirements of responses to York Hospital in Wells, Maine. In this policy, Lapolla instructs all staff to ensure that a Paramedic must be onboard the ambulance for every transfer from York Hospital in Wells, Maine, even though such transfers should be designated interfacility transfers.

61. Lapolla also instructs all EMTs, including Cryer, to denote all interfacility transfers as emergency transfers on the dispatch documentation, known as a patient care report, for each patient. Lapolla then personally submits claims for reimbursement from MaineCare, CMS, and private insurance carriers at the higher emergency transfer rates.

62. Chris Mooney, the director of the Ogunquit EMS service, where Cryer is also employed, informed Cryer that Lapolla has been told by MaineCare on multiple occasions that the billing submissions from WEMS are incorrect and need to be fixed.

63. However, according to Mooney, Lapolla continued to bill all transfers as emergency transfers.

64. For example, Patient R.G. was transferred by Cryer and his teammate from an urgent care center in Wells, Maine to a hospital in York, Maine, in September 2019.

65. Although this transfer should have been classified as an interfacility transfer, Cryer and his teammate were instructed to indicate that this transport was an emergency response.

66. The patient care report associated with the transfer indicated that the transport mode was "Emergent (Lights and Sirens)" and that the response mode was "Immediate."

67. Billing for interfacility transfers such as these normally requires the completion of a medical necessity form, known as a Physician Certification Statement for Non-Emergency Ambulance Services.

68. However, employees at Wells Emergency Medical Services do not include medical necessity forms because the transfers are always billed as emergency transports by Lapolla.

69. On September 4, 2019, Lapolla sent an email to all staff notifying them that the medical necessity form is required for transports that originate from York Hospital in Wells, Maine. In his email, Lapolla stated that "apparently this form should have been collected in the past."

70. On September 12, 2019, Lapolla admonished the duty crew for not bringing medical necessity forms on IFTs and for designating IFTs as emergency transports.

71. Cryer estimates that WEMS improperly upcodes approximately 150 interfacility transfers per year.

72. Cryer further estimates that this activity has been ongoing for over ten years.

73. Per CMS's CY2019 Fee Schedule, non-emergency interfacility transfers are normally reimbursable at a rate of $237.00 per transfer for the carrier code and locality code assigned to Wells, Maine.

74. WEMS submits requests for reimbursement using emergency transfer rates, which are between $380.00 and $452.00 per transfer.

75. Thus, the total damages resulting from the improperly upcoded ambulance transfers are approximately $267,712.50 over ten years.

**b. WEMS Changes its Policies after Cryer's Numerous Complaints**

76. Cryer began raising concerns to Lapolla regarding WEMS's improper practices in or around September 2019.

77. After verbally confronting Lapolla about the IFT issue in or around September 2019, Lapolla responded, "what color is my shirt?", referring to the fact that as a supervisor, he was in charge of policy decisions

78. Cryer eventually wrote emails to the WEMS Board of Directors and testified at a Board of Directors meeting that WEMS was improperly designating its IFTs as emergency transports.

79. The WEMS Board of Directors did nothing to address or resolve the issues.

80. Finally, Cryer wrote emails to the Wells Board of Selectmen and to Maine EMS raising the same issues that he raised to Lapolla and the WEMS Board of Directors.

81. On or about October 1, 2019, after ten years of inappropriately classifying interfacility transfers as emergency transfers, Lapolla released a revised policy regarding the classification and billing of interfacility transfers.

82. The revised policy instructs WEMS employees to classify all transports from York Hospital in Wells, Maine as non-emergency interfacility transfers unless deemed an emergency by the clinical staff.

**c. WEMS Transports Patients to York Hospital in Exchange for Low Rent**

83. WEMS is located in the Wells Regional Medical Community Building at 114 Sanford Road, Wells ME, 04090.

84. The Wells Regional Medical Community Building is owned and operated by York Hospital.

85. York Hospital charges WEMS $1.00 per month in rent.

86. In exchange, WEMS transports all patients to York Hospital.

87. Pursuant to 42 CFR § 410.40, Medicare covers transports to the nearest hospital, critical access hospital, or skilled nursing facility that is capable of furnishing the required level and type of care for the beneficiary's illness or injury.

88. Pursuant to Maine EMS Prehospital Treatment Protocols, if a patient needs care which the ambulance crew believes cannot be provided at the most accessible hospital, the patient will be transported to nearest facility capable of providing that care upon the patient's arrival.

89. Southern Maine Health Care is located 13.7 miles away from Wells Emergency Medical Services.

90. York Hospital is located 14.4 miles away from Wells Emergency Medical Services.

91. Southern Maine Health Care is capable of providing the same services that are available at York Hospital, as well as a number of services that are not provided at York Hospital.

92. Lapolla's contact at York Hospital is James Kennedy, the EMS Coordinator.

### d. WEMS Violated Maine EMS Protocols by Using Taxpayer Funds to Install Unnecessary Equipment into Ambulances

93. The regulations governing the equipment that may be installed in an ambulance in Maine are set forth in Chapter 17 of the Maine EMS System Rules.

94. Pursuant to Chapter 17 of Maine EMS System Rules, equipment and supplies that the transport services judges to be equivalent to those listed in the rules require specific approval from Maine EMS before such a substitution is made.

95. In 2018, Brian Langerman, a paramedic at WEMS, discovered that WEMS used $60,000 in taxpayer funds to purchase three LUCAS CPR machines, which perform CPR on patients automatically.

96. Because the installation of the machines was not approved by Maine EMS, Langerman and Cryer contacted Maine EMS and informed them of the violation.

97. After Maine EMS instructed WEMS and Lapolla to remove the machines, WEMS resisted.

98. Thereafter, Maine EMS threatened to take away the licenses of WEMS and its technicians pursuant to Chapters 3 and 5 of the Maine EMS System Rules.

99. After Lapolla continued to refuse to remove the machines, Langerman and Cryer made a formal complaint to Maine EMS.

100. Following Langerman's formal complaint, Lapolla removed the CPR machines from the ambulances.

101. On May 1, 2019, Langerman resigned. Following Langerman's resignation, Langerman and Cryer sent emails to the WEMS Board of Directors to warn them of Lapolla's mismanagement and misappropriation of funds.

102. The Board of Directors did not take any actions following Langerman's email.

**e. WEMS Retaliates Against Cryer**

103. Cryer communicated his concerns regarding WEMS' practice of upcoding all interfacility transfers as emergency transfers to Lapolla initially in November 2018 and again in September 2019.

104. Prior to raising these concerns, Cryer was typically scheduled to work 24-36 hours every weekend.

105. However, following Cryer's complaints about WEMS's upcoding practices and his concerns about the improper installation of the CPR machines into WEMS ambulances, Lapolla reduced Cryer's hours to 24-36 per month, starting in October 2019.

106. In February and March 2020, Cryer was not placed on the schedule at all.

## <u>COUNT I</u>
## Violation of the False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)
## Against All Defendants

107. Cryer realleges and incorporates the allegations set forth above as though fully alleged therein.

108. The False Claims Act imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

109. Defendants knowingly presented or caused to be presented false claims to CMS when they submitted claims for payment for non-emergency interfacility transfers at the significantly higher emergency transport rates.

110. The United States, unaware of the falsity of the claims made by Defendants, and in reliance on the accuracy thereof, paid Defendants for such false claims.

111. By reasons of the acts and conduct of WEMS in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT II
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### Against Defendants WEMS and James Lapolla

112. Cryer realleges and incorporates the allegations set forth above as though fully alleged therein.

113. The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

114. Defendants knowingly made or caused to be made, false records or statements material to the false and fraudulent claims when they instructed WEMS staff to classify all transfers as emergency transfers on patient care reports, regardless of whether or not the transfers were actual emergencies.

115. The United States relied on these falsified records when it paid WEMS' claims.

116. By reasons of the acts and conduct of WEMS in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT III
## Violation of the False Claims Act
## 31 U.S.C. § 3729(a)(1)(G)
## Against Defendants WEMS and James Lapolla

117. Cryer realleges and incorporates the allegations set forth above as though fully alleged therein.

118. The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G).

119. Defendants knowingly and improperly avoided an obligation to pay or transmit money or property to the Government when it corrected its improper conduct of billing all IFTs as emergency transfers but did not pay back the overpayments it received during its period of noncompliance.

120. By reasons of the acts and conduct of WEMS in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

**COUNT IV**
**Retaliation against Relator in Violation of the False Claims Act**
**31 U.S.C. § 3730(h)**
**Against Defendants WEMS and James Lapolla**

121. Cryer realleges and incorporates the allegations set forth above as though fully alleged herein.

122. Cryer is an "employee" and WEMS is an "employer" as the term is defined by the False Claims Act.

123. Defendants reduced Cryer's hours, in part, because he voluntarily performed lawful acts to investigate and stop one or more violations of the False Claims Act, including complaining about the unlawful upcoding policies at WEMS.

124. Cryer engaged in protected activity when he spoke directly to Lapolla regarding the upcoding policy in November2018 and September 2019.

125. Defendant, knowing that Cryer was engaging in such activity, reduced his hours starting in October 2019.

126. Temporal proximity between Cryer's disclosures and the reduction of Cryer's hours is strongly suggestive of causation.

127. To redress harms he suffered as a result of the acts and conduct of defendants in violation of 31 U.S.C. § 3730(h), Relator is entitled to damages including two times the amount

of back pay, interest on back pay, and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees.

**COUNT V**
**Violation of the Anti-Kickback Statute**
**42 U.S.C. § 1320a-7b(b)**
**Against All Defendants**

128. Cryer realleges and incorporates the allegations set forth above as though fully alleged herein.

129. The Anti-Kickback Statute prohibits offering, paying, soliciting, or receiving anything of value to induce rewards, referrals, or general federal health care business, including Medicare and Medicaid. See 42 U.S.C. § 1320a-7b(b).

130. Defendants knowingly transported patients to York hospital instead of a hospital located two miles closer to defendant in exchange for rent far below market value at a facility owned by York hospital.

131. The result of Defendants' actions has led the Government to pay for items that resulted from prohibited activities under the Anti-Kickback Statute in order to generate financial compensation for Defendants at the expense of the Government.

132. By reasons of the acts and conduct of Defendants in violation of 42 U.S.C. § 1320a-7b(b), the United States has suffered actual damages.

**COUNT VI**
**Violation of the Maine False Claims Act**
**22 M.R.S.A. § 15 (2013)**
**Against All Defendants**

133. Cryer realleges and incorporates the allegations set forth above as though fully alleged therein.

134. The Maine False Claims Act imposes liability on any person who makes or causes to be made or presents or causes to be presented for payment or approval any claim upon or against the department or upon any funds administered by the department, knowing such claim to be materially false, fictitious or fraudulent, or who knowingly makes any false written statement or knowingly submits any false document material to a false, fictitious or fraudulent claim. 22 M.R.S.A. § 15 (2013).

135. Defendants made or caused to be made for payment a claim against the Maine Department of Health and Human Services, knowing such claim to be materially false, fictitious or fraudulent, when they submitted claims for payment to the department for non-emergency interfacility transfers at the significantly higher emergency transport rates.

136. Defendants made or caused to be made a materially false document material to false, fictitious or fraudulent claim when they instructed WEMS staff to classify all transfers as emergency transfers on patient care reports, regardless of whether or not the transfers were actual emergencies.

137. The State of Maine, unaware of the falsity of the claims made by Defendants, and in reliance on the accuracy thereof, paid Defendants for such false claims.

138. By reasons of the acts and conduct of Defendants in violation of 22 M.R.S.A. § 15 (2013), the State of Maine has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

(e) That, in the event that the Government does not proceed with this action, Cryer be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2);

(f) That, pursuant to 31 U.S.C. § 3730(c)(5), Cryer be awarded a share of any alternate remedy that the Government elects to pursue;

(g) That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint;

(h) That the Government and Cryer be awarded prejudgment and post judgment interest;

(i) That the Government and Cryer receive all relief, both at law and in equity, to which they may be reasonably entitled; and

(j) For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Scott Cryer demands a jury trial.

Respectfully submitted,

Jeffrey Neil Young, Esq. (Maine Bar No. 003874)
Carol J. Garvan, Esq. (Maine Bar No. 004448)
Johnson, Webbert & Young, LLP
P.O. Box 79, 160 Capitol St., Suite 3
Augusta, ME 04332
Phone: (207) 623-5110
Facsimile: (207) 622-4160

R. Scott Oswald (*pro hac vice to be filed*)
Lydia A. Pappas (*pro hac vice to be filed*)
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
Phone: (202) 261-2813
Facsimile: (202) 261-2835
roswald@employmentlawgroup.com
lpappas@employmentlawgroup.com
*Counsel for Plaintiff-Relator Scott Cryer*